UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
                                                          :
TAMARA STARSHINOVA, MARINA                                :
VASILYANSKAYA, and RAFAIL                                 :
TZENTZIPER,                                               :
                                                          :                11-CV-9498 (KMW)
                                    Plaintiffs,           :                OPINION & ORDER
                                                          :
            - against -                                   :
                                                          :
OLEG BATRATCHENKO, et al.,                                :
                                                          :
                                    Defendants.           :
-----------------------------------------------------------------X

KIMBA M. WOOD, U.S.D.J.:

        Russian citizens Tamara Starshinova ("Starshinova"), Marina Vasilyanskaya

("Vasilyanskaya"), and Rafail Tzentziper ("Tzentziper") (collectively, "Plaintiffs"), on behalf of

themselves and as assignees for 551 individuals set forth in Schedule A of their Amended

Complaint, bring this action seeking millions of dollars in damages for an alleged massive fraud

involving various funds in which Plaintiffs invested.  Plaintiffs' Amended Complaint alleges

eleven causes of action, including violations of federal law under the Commodities Exchange

Act and the Securities Exchange Act of 1934 and various state law claims.  [Dkt. No. 47].

        Defendants Oleg Batratchenko ("Batratchenko"); Thor United Corp. (USA); Thor United

Corp. (Nevis); Thor Asset Management, Inc.; Thor Opti-Max, LLC; Thor Real Estate

Management, LLC; Thor Capital, LLC; Thor Futures, LLC; Thor Opti-Max Fund, Ltd.; Thor

Guarant Real Estate Fund, Ltd. (BVI); Thor Real Estate Master Fund, Ltd. (BVI); Thor Realty

Holdings, LLC; Optima Investment Holdings, Ltd.; and Thor Guarant, LLC (the "Thor Entities"[1]

---

[1] The Amended Complaint also lists TREMF Capital, LLC as a defendant, but the record does not
indicate that this party has been served.  Based on Plaintiffs' Amended Complaint, the Court presumes
this is the same entity as Thor Real Estate Master Fund.  (*See* Am. Compl. ¶ 114).

and, collectively with Batratchenko, "Defendants") move to dismiss the Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6).  [Dkt. No. 55]. For the following reasons, Defendants' motion is GRANTED.

## I.    BACKGROUND

### A.  <u>Materials Considered on a Motion to Dismiss</u>

As a threshold matter, both parties have submitted supplemental materials that they would like the Court to consider in resolving the pending motion.  Defendants have attached copies of Investment Memoranda ("IMs") on which Plaintiffs allegedly relied in making their investment decisions.  (Wallace Decl. [Dkt. No. 56]).  Plaintiffs have submitted an affirmation challenging Defendants' translation of the IMs (originally in Russian), (Agarkova Aff. [Dkt. No. 63]), and a declaration of supplemental facts by plaintiff Tzentziper.  (Tzentziper Decl. [Dkt. No. 64]).

In considering motions to dismiss under Rule 12(b)(6), the district court "is normally required to look only to the allegations on the face of the complaint." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007).  If the parties present materials outside the pleadings, the court may consider them only by converting the motion to dismiss into a motion for summary judgment and providing all parties with a "reasonable opportunity" to present pertinent material. Fed. R. Civ. P. 12(b).  This conversion is "strictly enforced" and "mandatory."  *Global Network Comm'cns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006).  Consideration of outside materials at the motion to dismiss stage may warrant reversal, if the ruling "makes a connection not established by the complaint alone or contains an unexplained reference that raises the possibility that it improperly relied on matters outside the pleading." *Friedl v. City of New York*, 210 F.3d 79, 84 (2d Cir. 2000).

This standard bars the Court's consideration of Tzentziper's declaration.  *See Friedl*, 210 F.3d at 84-85 (vacating district court's ruling that relied on factual contentions contained in a declaration in support of defendants' motion to dismiss).  Defendants argue that the Court should consider the IMs because the Amended Complaint "relies heavily upon [their] terms and effect" such that they are "integral to the complaint."  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  The Court finds consideration of the IMs inappropriate for two reasons.  First, it is not clear that the IMs were integral to Plaintiffs' claims; although they are referenced, Plaintiffs' claims regarding Defendants' misrepresentations go well beyond the statements contained in the IMs, including statements Batratchenko made at marketing meetings and at annual conferences.  (*Id.* ¶¶ 69, 78).  Second, given Plaintiffs' challenge to the accuracy of Defendants' translation of the IMs, (*see* Agarkova Aff.), the IMs should be considered in deciding a motion to dismiss.  *See Faulkner v. Baer*, 463 F.3d 130, 134 (2d Cir. 2006) (overturning district court decision relying on outside documents that did not consider authenticity, accuracy, or relevance of various documents).

Accordingly, the Court considers solely the allegations contained in Plaintiff's Amended Complaint, which the Court assume to be true for the purposes of Defendants' motion.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### B.  Factual and Procedural Background

Plaintiffs are all citizens of the Russian Federation.   (Am. Compl. ¶¶ 5-7).  They bring this action on behalf of themselves and hundreds of other investors who seek to recover money that they contributed to investment programs managed and controlled by Defendants.  Batratchenko, a U.S. citizen residing in Moscow, is the "co-founder, principal, officer, owner, employee, and/or agent" of the Thor Entities, a series of related domestic and foreign companies

operating a number of "programs" that invest in U.S. and foreign stocks, commodities, and real estate.  (*Id.* ¶¶ 9, 32).

This suit arises from Plaintiffs' investments in three of the Thor Entities' investment programs: the Thor Optima Program, the Thor Opti-Max Program, and the Thor Guarant Program.  (*Id.*  ¶ 35).  In 2003, Batratchenko created the Thor Optima Program, and attracted investors by promising stable returns "regardless of the market conditions."  (*Id.* ¶ 43).  Batratchenko pledged to invest in "relatively liquid instruments," and promised returns based on a "market-neutral investment strategy" that would change based on "algorithms of statistical arbitrage, dynamic allocation of assets and computerized system trading."  (*Id.* ¶¶ 44-46).  The Thor Guarant Program purported to invest in "international real estate," was "highly liquid," claimed to "minimize 'the numerous risks associated with investments in individual properties,'" and promised "stable profits of 20-25 percent per year regardless of market conditions."  (*Id.* ¶¶ 54-55).  The Thor Opti-Max Program focused on real estate and financial investments, including investments in both the Thor Optima and Thor Guarant Programs.  (*Id.* ¶ 60).  All of the programs were managed by various Thor Entities; investors  signed a power of attorney authorizing Thor United and its representatives to act as agents on behalf of investors.  (*Id.* ¶ 68).

Plaintiff Tzentziper invested $190,538.87 in Thor Optima and Thor Opti-Max between September 2003 and April 2010; Plaintiff Vasilyanskaya invested $37,017 of her own money and $80,000 of her son's money in Thor Optima between July 2004 and April 2010; and Plaintiff Starshinova invested $21,900 in Thor Optima between September 2004 and April 2010.  (*Id.* ¶¶ 75-77).  Plaintiffs assert that these investments were made in reliance on various misrepresentations made by Defendants, including "[p]romises of safety of their principal, substantial returns on their investments and high liquidity," and "returns of 15-25% annually."

(*Id.* ¶¶ 70-73).  Plaintiffs also assert that hundreds of other individuals, also plaintiffs in this suit, invested in reliance on these "misrepresentations."  (*Id.* ¶ 79).  Plaintiffs also served as "freelance financial consultants" and solicited others to invest more than $20 million in the Thor programs "on a commission basis."  (*Id.* ¶ 81).

Periodic account statements issued by the Thor Entities prior to 2008 reflected returns as high as 50%.  (*Id.* ¶ 99).  After the "worldwide economic crisis" in 2008, Plaintiffs became "concerned" about the program.  (*Id.* ¶ 100).  To assuage these concerns, Batratchenko attended a number of meetings in New York and Russia at which he represented "that despite the ailing economy, the Thor Program continued to perform well" and that it operated just as well in a failing market as it did in a strong market.  (*Id.*).  In 2008, Batratchenko sent investors a letter asserting that "the New York residential property market would need to experience a threefold decline" in order for the funds to lose money.  (*Id.* ¶ 122).

In 2009, however, Batratchenko announced that the SEC had "frozen all funds and assets of the Thor Optima Program."  (*Id.* ¶ 101).  Batratchenko and the Thor Group claimed that the SEC had frozen all of the Thor Optima Program's assets, (*id.* ¶ 101), and, "as a result of 'radical reform of the U.S. financial markets regulatory system,' the procedure for redemption or removal of funds from the Thor Optima Program ha[d] changed and became more complicated."  (*Id.* ¶ 102).  In late 2009, the Thor Opti-Max and Thor Guarant programs showed a 50% decline, at which time the remaining investors sought to redeem their investments.  (*Id.* ¶ 108).  Defendants made no payments in response to any of these requests.  (*Id.* ¶ 106).  In August of 2010, Batratchenko sent a letter to all investors saying he could not return the funds because they were tied up in illiquid investments, such as real estate.  (*Id.* ¶ 111).

Plaintiffs filed this action on December 23, 2011 [Dkt. No. 1], and filed an Amended Complaint on May 25, 2012.  [Dkt. No. 47].  The Amended Complaint alleges violations of the Commodities Exchange Act ("CEA") (Count I) and the Securities Exchange Act ("SEA") (Counts II and III), asserts state law claims for breach of contract (Count IV), common law fraud (Count V), breach of fiduciary duty (Count VI), unjust enrichment (Count VII), constructive trust (Count VIII), accounting (Count IX), and negligence (Count X), and seeks a declaratory judgment that Defendants owe millions of dollars in damages on each count (Count XI).  Defendants moved to dismiss the Amended Complaint on June 11, 2012, [Dkt. No. 55], and Plaintiffs filed their opposition memorandum on July 25, 2012.  [Dkt. No. 62].  On December 26, 2012, the case was transferred to the undersigned.  [Dkt. No. 66].

## II.     LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead facts sufficient "to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when the factual allegations "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  Where a plaintiff has failed to "nudge" a claim "across the line from conceivable to plausible," a district court must dismiss the complaint.  *Twombly*, 550 U.S. at 570.  Although a court is "not bound to accept as true a legal conclusion couched as a factual allegation," *id.* at 555, a court must accept as true all well-pleaded factual allegations in the complaint, and "draw[] all inferences in the plaintiff's favor."  *Allaire Corp. v. Okumus*, 433 F.3d 248, 249-50 (2d Cir. 2006) (internal quotations omitted).  "[T]he standards for dismissal under 12(b)(6) and 12(b)(1) are substantively identical."  *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d Cir. 2003).[2]

---

[2] Plaintiffs' fraud claims must also meet the heightened pleading standards of Federal Rule of Civil Procedure 9(b), and their securities fraud claims must satisfy the standard in the Private Securities

### III.     ANALYSIS

Plaintiffs plead both federal and state law claims.  This Court has subject matter jurisdiction over the federal claims pursuant to 28 U.S.C. § 1331, and Plaintiffs assert that the Court should exercise supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367, because these claims form part of the same case or controversy.  Defendants argue that Plaintiffs' federal law claims must be dismissed because neither the SEA nor the CEA apply to transactions that occurred outside of the United States, and Plaintiffs have not alleged that any of the purported trades occurred within the United States.[3]  Defendants also contend that Plaintiffs lack standing to bring a private action under the CEA.  Should the Court dismiss Plaintiffs' federal law claims, Defendants argue, there is no basis to exercise supplement jurisdiction over the state law claims.

### A.  Claims Under the Securities Exchange Act

Plaintiffs assert that Batratchenko and a subset of the Thor Defendants have violated Section 10(b), Rule 10b-5, and Section 20(a) of the SEA.  Section 10(b) makes it unlawful, in connection with the purchase or sale of any security, to use or employ "any manipulative or deceptive device or contrivance in contravention of" the rules that the Securities Exchange Commission ("SEC") deems "necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78j(b).  In accord with this provision, the SEC promulgated Rule 10b-5, which makes it unlawful, in connection with the purchase or sale of any security, to "employ any device, scheme, or artifice to defraud," to make any material misrepresentation or omission,

---

Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b); *see also Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 108 (2d Cir. 2012).  Because this Opinion dismisses Plaintiffs' claims without reaching the sufficiency of Plaintiffs' fraud allegations, the Court does not apply these standards.

[3] Although Defendants characterize this concern as an issue of the Court's subject matter jurisdiction, Plaintiffs note correctly that applicability of Section 10(b) is a "merits question."  *Morrison v. Nat'l Australia Bank, Ltd.*, 130 S. Ct. 2869, 2877 (2010).

or to engage in "any act, practice, or course of business" operating as a fraud or deceit.  17 C.F.R. § 240.10b-5.  Section 20(a) imposes joint and several liability on "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder…unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation."  15 U.S.C. § 78t.

The Supreme Court recently decided that Section 10(b) applies only to domestic, and not to extraterritorial, securities transactions.  *See Morrison v. Nat'l Austl. Bank, Ltd.*, 130 S. Ct. 2869, 2883 (2010) ("[T]here is no affirmative indication in the Exchange Act that § 10(b) applies extraterritorially, and we therefore conclude that it does not.").  After *Morrison*, to fall within the scope of Section 10(b), the case must involve either (1) purchases and sales of securities listed on domestic exchanges or (2) "domestic purchases and sales" of securities not registered on domestic exchanges.  *Id.* at 2884-85.

The securities at issue in this case are the "ownership interests" that Plaintiffs acquired in the Thor Optima and Thor Guarant programs when they purchased shares in Thor United.  (Am. Compl. ¶ 143).  Plaintiffs do not (and cannot) fall within the first Section 10(b) category, because the shares that they purchased were not listed on a domestic exchange.  The Second Circuit has decided that allegations satisfy the requirement of the second category only when a plaintiff "allege[s] facts suggesting that irrevocable liability was incurred or title was transferred within the United States."  *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 68 (2d Cir. 2012).  Under this test, the location of the broker, the identity of the parties, and the nature of the securities are irrelevant; the *only*, consideration is whether or not the parties became "bound to effectuate a transaction"—either to take and pay for, or to deliver, a security—in the United States.  *Id.* at 68-69.  Plaintiffs contend that their SEA claims properly fall within the second

Section 10(b) category because Defendants became irrevocably bound in New York to sell the shares to Plaintiffs.

In *Absolute Activist*, the Second Circuit upheld the district court's dismissal of a complaint where "the sole allegation" affirmatively stating that the transactions took place in the United States did so "in conclusory fashion," providing no details regarding "the formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money." *Id.* at 70. Courts applying *Morrison* and *Absolute Activist* have likewise insisted on specific, concrete allegations regarding the transfer of title or the incurring of irrevocable liability. For example, plaintiffs who provided contract notes from hedge fund account managers that read "WE BOUGHT [SOLD] FOR YOUR ACCOUNT IN: NYS," were deemed to have raised a plausible inference that plaintiffs' purchases took place in the United States. *In re Optimal U.S. Litig.*, 813 F. Supp. 2d 351, 373 (S.D.N.Y. 2010) (Scheindlin, J.); *see also In re Optimal U.S. Litig.*, 865 F. Supp. 2d 451, 453 (S.D.N.Y. 2012) (same) (upholding earlier holding in light of *Absolute Activist*). By contrast, plaintiffs who failed to allege where a stock purchase agreement was drafted or signed failed to meet the standard. *Pope Invs. II, LLC v. Deheng Law Firm*, No. 10 Civ. 6608, 2012 WL 3526621, at *7 (S.D.N.Y. Aug. 15, 2012) (Stanton, J.); *see also In re Vivendi Universal, S.A. Sec. Litig.*, 284 F.R.D. 144, 151-52 (S.D.N.Y. 2012) (Scheindlin, J.) (refusing to certify class action for shareholders who received shares as part of a merger agreement where agreement was executed abroad, even though shares were transferred in the United States, because "irrevocable liability occurs when (and where) there is a binding contract for the purchase or a sale of a security").

Plaintiffs contend that they have pled facts from which it can plausibly be inferred that Defendants incurred irrevocable liability to sell ownership interests in Thor United in the United

States because "the investor applications to the Thor Programs were approved and accepted in the New York office of Thor United, and investor policies were issued in New York." (Pls.' Mem. 12-13 [Dkt. No. 62]). However, the Amended Complaint pleads no facts to support Plaintiffs' contention that the agreements were "approved and accepted in New York." (*See* Am. Compl. ¶¶ 76-77 (describing Plaintiffs' agreements without specifying where they were entered). The only allegations in the Amended Complaint concerning New York are that Thor United (the parent company of the Thor Entities which administered the Thor Entities' funds) had its principal place of business in New York, (Am. Compl. ¶¶ 10, 34, 37), that Batratchenko attended some meetings in New York after the agreements were executed, (*id.* ¶ 100), and that the funds invested some money in New York real estate, (*id.* ¶ 122).[4]  Even drawing all reasonable inferences in Plaintiffs' favor, the Court finds that these allegations are insufficient to support a "plausible inference" that Defendants incurred irrevocable liability in the United States. *See Absolute Activist*, 677 F.3d at 68. Plaintiffs have thus failed to state a claim under the SEA.

**B.   Claims Under Section 4*o* of the Commodities Exchange Act**

Defendants argue that the *Morrison* decision regarding the territorial reach of the SEA "applies with equal force" to Plaintiffs' claims under the CEA, and, because the transactions occurred abroad, these claims must be dismissed. (Defs.' Mem. 13). Defendants also argue that Plaintiffs lack standing under Section 22(a) of the CEA. The Court agrees with both contentions.

1.   The *Morrison* Presumption Against Extraterritoriality Applies to the CEA

Although no case law directly addresses whether the *Morrison* reasoning applies to the CEA, the Court finds that such application is warranted. *Morrison* emphasized the "longstanding principle" that congressional legislation, "unless a contrary intent appears, is

---

[4] Plaintiffs' memorandum in opposition to Defendants' motion asserts further factual allegations based on the IMs. As noted above, however, the Court declines to consider these materials in resolving Defendants' motion and consequently confines its analysis to the allegations of the Amended Complaint.

meant to apply only within the territorial jurisdiction of the United States." *Morrison*, 130 S. Ct. at 2877 (quoting *EEOC v. Arabian Am. Oil Co. (Aramco)*, 499 U.S. 244, 248 (1991)). Absent a "clearly expressed," "affirmative intention" to give a statute extraterritorial effect, courts are directed to "presume it is primarily concerned with domestic conditions." *Id.* In short, "[w]hen a statute gives no clear indication of an extraterritorial application, it has none." *Id.* at 2878.

Pre-*Morrison* case law squarely determined that Section 4 of the CEA does not affirmatively indicate that it applies extraterritorially. *E.g. de Atucha v. Commodity Exchange, Inc.*, 608 F. Supp. 510, 519-24 (S.D.N.Y. 1985) (Lasker, J.) (performing comprehensive analysis of CEA § 4, including statutory language and legislative history, to determine that it does not apply extraterritorially); *see also Psimenos v. E.F. Hutton & Co., Inc.*, 722 F.2d 1041, 1044 (2d Cir. 1983) (noting that "[i]n construing the reaches of jurisdiction under the CEA, courts have analogized to similar problems under the securities laws which have been more extensively litigated" and making such an analogy with respect to extraterritorial application); *Rohrer v. FSI Futures, Inc.*, 981 F. Supp. 270, 276-77 (S.D.N.Y. 1997) (Haight, J.) (stating that the CEA is "silent regarding the extraterritorial jurisdiction over cases of alleged fraud"); *Societe Nationale d'Exploitation Industrielle des Tabacs et Allumettes v. Salomon Bros. Int'l Ltd.*, 928 F. Supp. 398, 402-03 (S.D.N.Y. 1996) (Sweet, J.) (same).

Moreover, after reviewing the CEA in accordance with the principles of statutory interpretation laid out in *Morrison*, the Court finds no basis to conclude that the CEA applies abroad. First, the Court finds no language in § 4*o* to support a finding that it applies extraterritorially. Like § 10(b), § 4*o* "[o]n its face…contains nothing to suggest it applies abroad." *Morrison*, 130 S. Ct. at 2881. It reads:

> (1) It shall be unlawful for a commodity trading advisor, commodity pool operator, or associated person of a commodity pool operator, by use of the

> mails or any means or instrumentality of interstate commerce, directly or
> indirectly—
> (A) to employ any device, scheme, or artifice to defraud any client or
> participant or prospective client or participant; or
> (B) to engage in any transaction, practice, or course of business which
> operates as a fraud or deceit upon any client or participant or prospective
> client or participant.

7 U.S.C. § 6*co*.  Petitioners, supported by the Solicitor General, argued in *Morrison* that

Section 10(b)'s reference to "interstate commerce," which included commerce between "any

foreign country and any State," justified extraterritorial application.  *Morrison*, 130 S. Ct. at

2882.  The Supreme Court rejected this contention, and noted that "even statutes that contain

broad language in their definitions of 'commerce' that expressly refer to *foreign* commerce do

not apply abroad."  *Id.* (quoting *Aramco*, 499 U.S. at 251).  Consequently, the reference to

"interstate commerce" in Section 4*o* does not indicate Section 4*o* was intended to apply abroad.

Further, the provisions of the CEA that do mention extraterritorial application support the

proposition that § 4*o* does not apply extraterritorially.  Section 4(b) restricts the jurisdiction of

the Commodity Futures Trading Commission ("CFTC") to persons "located in the United

States," and notes that "[n]o rule or regulation may be adopted" under this subsection that

requires the CFTC to approve any rules or contracts proposed by a foreign commodities board,

or which "governs in any way" any rule or contract for a foreign board.  7 U.S.C. § 6(b).  These

provisions that do refer to extraterritorial application emphasize that the CEA is not designed to

apply abroad.  In light of the text of § 4*o*, other provisions of the CEA, and pre-*Morrison*

precedent, the Court holds that "there is no clear indication of extraterritoriality" in the CEA.  *Id.*

2.   The Transaction Test Applies and the Alleged Transactions Do Not Satisfy It Because
     Irrevocable Liability Was Incurred Abroad

Prior to *Morrison*, the Second Circuit determined whether or not to apply Section 10(b)

extraterritorially by applying a case-by-case "conduct or effect test," which asked (1) whether the

wrongful conduct occurred in the United States and (2) whether the wrongful conduct had an effect in the United States or on its citizens. *See, e.g.*, *SEC v. Berger*, 322 F.3d 187, 192-93 (2d Cir. 2003). The *Morrison* Court expressly overruled this approach and held that the presumption against extraterritoriality "applied in *all* cases, preserving a stable background against which Congress can legislate with predictable effects." *Morrison*, 130 S. Ct. at 2881 (emphasis added). Courts in this district had previously applied the "conduct or effect test" to claims under the CEA. *See, e.g.*, *Rohrer*, 981 F. Supp. at 276-77 (applying conduct or effect test to claims brought under Section 4b of the CEA); *Salomon Bros.*, 928 F. Supp. at 402-03 (applying conduct or effect test to claims brought under Sections 4 and 4(b) of the CEA). Given the clear parallel between the SEA and the CEA and the *Morrison* Court's specific rejection of case-by-case determinations, the Court finds that the *Morrison* decision abrogated the conduct and effects test in the CEA context as well. *Morrison*, 130 S. Ct. at 2881.

Thus, the scope of CEA § 4*o* is the same as SEA § 10(b):[5] it applies to transactions involving entities listed on domestic exchanges, or to domestic purchases and sales where either party has "incurred irrevocable liability within the United States." *Absolute Activist*, 677 F.3d at 68. Plaintiffs' CEA claim relies on the same allegations as their SEA claim, and the Court applies the same analysis. Consequently, Plaintiffs' claim under the CEA is dismissed.

---

[5] Unlike Section 10(b), the status of the trader as a registered commodities operator is important for liability under Section 4*o*, and Section 4*o* regulates a somewhat broader category of activity. *Compare* 15 U.S.C. § 78j(b) ("[I]n connection with the purchase or sale of any security registered…"), *with* 7 U.S.C. § 6*o*(1)(B) ("[A]ny transaction, practice, or course of business…"). However, Section 22(a) restricts the private right of action under Section 4*o* to those litigants who purchased or sold a commodities interest. 7. U.S.C. § 25(a)(1). Consequently, the Court applies the transaction test set forth in *Absolute Activist* in the CEA context. *See also Psimenos*, 722 F.2d at 1044 (noting that courts have analogized the CEA to the SEA, which has been more extensively litigated).

3.  Standing Under the CEA

Alternatively, even if the CEA were to apply extraterritorially, Plaintiffs' CEA claim must still be dismissed under Rule 12(b)(1) because Plaintiffs lack standing.  Section 22 of the CEA "enumerates the *only* circumstances under which a private litigant may assert a private right of action for violations of the CEA."  *Klein & Futures, Inc. v. Bd. of Trade of City of N.Y.C.*, 464 F.3d 255, 259 (2d Cir. 2006) (emphasis added); *see also* 7 U.S.C. § 22(b)(5) (explaining that private rights of action enumerated in Section 22(b) "shall be the exclusive remedy… available to any person who sustains a loss as a result" of a CEA violation).  To have standing under Section 22, a private plaintiff must fall into one of four categories: a plaintiff must either have (A) received trading advice from Defendants for a fee; (B) traded through Defendants or deposited money with Defendants in connection with a commodities trade; (C) purchased from or sold to Defendants or placed an order for purchase or sale of a commodity through them; or (D) engaged in certain market manipulation activities in connection with the purchase or sale of a commodity contract.  7 U.S.C. § 25(a)(1)(A)-(D); *see also Klein & Futures*, 464 F.3d at 260.  Plaintiffs' allegations do not support standing under any of these categories.

The Amended Complaint refers to the Thor Entities' role in commodities markets only tangentially.  Plaintiffs allege that Thor Asset Management, Thor Opti-Max, LLC, Thor United Corp., Thor Futures, LLC, and Thor Opti-Max Fund were all registered as Commodity Trading Advisors or Commodity Pool Operators, and that Batratchenko was registered as "Principal Approved" for several of these entities.  (Am. Compl. ¶¶ 126-131).  According to Plaintiffs, Batratchenko and some of the Thor entities "engaged in the business of advising commodity pools which included Plaintiffs' funds," including the Opti-Max Fund.  (*Id.* ¶ 133).  These Defendants allegedly defrauded Plaintiffs by making various misrepresentations, including

providing fraudulent account statements, failing to disclose that they were not licensed, and misrepresenting the Thor funds' investment strategies.  (*Id.* ¶¶ 134-135).

Plaintiffs assert that they have standing under the first three subsections of Section 22(a)(1).  The Court disagrees.  First, Plaintiffs do not allege that they have received "trading advice" from Defendants; rather, they allege that they invested in funds managed by Defendants. (*Id.* ¶¶ 75-77).  Second, Plaintiffs did not trade through or deposit money in connection with a trade in commodities—they purchased shares of Thor United, (*id.* ¶ 50), with the understanding their money would be invested in a range of assets, perhaps including commodities, (*id.* ¶ 45). The trades at issue in this case are purchases of interests in Thor United, not the purchase of commodities.  *See Absolute Activist*, 677 F.3d at 70 (treating investor's purchase of security in index fund separately from index funds' ultimate purchase of domestic security).

Finally, for similar reasons, Plaintiffs did not use Defendants to purchase or place an order for commodities.  Plaintiffs appear to argue that the status of some Thor Entities as registered commodity pool operators indicates that it "purchased from Defendants an interest or participation in a commodity pool" when they invested in Thor Opti-Max by purchasing an interest in Thor United.  (Pls.' Mem. 13-14).  The Court disagrees.  Accepting all the allegations in the Amended Complaint as true, the Thor programs were represented as an index fund that invested in multiple instruments, perhaps including commodities.  Plaintiffs were attracted by funds' spread of risk over multiple types of asset and multiple countries, and they purchased shares of Thor Optima for those reasons.  (Am. Compl. ¶¶ 44-45).  The allegations, as set forth in the Amended Complaint, do not allege that Plaintiffs purchased commodities from Defendants.

Accordingly, even if the CEA were to apply to extraterritorial transactions, Plaintiffs' CEA claim fails under Rule 12(b)(1) because Plaintiffs do not have standing to raise it.

C.  **Plaintiffs' Remaining Claims**

The sole basis for subject matter jurisdiction in this case is 28 U.S.C. § 1331, which authorizes jurisdiction for Plaintiffs' claims under the CEA and the SEA.  (Am. Compl. ¶ 26). Now that the Court has dismissed Plaintiffs' federal law claims, however, it can no longer exercise supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367; consequently, those claims are dismissed as well.

IV.    **CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss Plaintiffs' Amended Complaint is GRANTED.  [Dkt. No. 55].  Any pending motions are moot.


SO ORDERED.

Dated: New York, New York
       March 15, 2013

                                    /s/_____
                                    Kimba M. Wood
                                    United States District Judge